## Case No. 14,468.

### UNITED STATES v. ARMSTRONG.

[20 Leg. Int. 212;[1] 5 Phila. 273.]

District Court, E. D. Pennsylvania. Aug. 22, 1862.

FRAUDS AGAINST THE UNITED STATES — FORGED PENSION PAPERS—INDICTMENT.

[1. Under the act of March 3, 1823 (3 Stat. 771), to punish frauds against the United States, an indictment may properly charge, in one count, that defendant caused to be transmitted to, and presented at, the pension office, forged papers, etc. The two acts of transmitting and presenting are not separate offenses under the statute.]

[1 [Reprinted from 20 Leg. Int. 212, by permission.]

[2. The common-law refinements in criminal pleading are not applicable to statutory offenses under the laws of the United States. It is sufficient, usually, to allege the offense in the very terms of the statute.]

The defendant [Christopher Armstrong] was tried upon several indictments framed under the two last clauses of the first section of the act of congress of 3d March, 1823 (3 Stat. 771), entitled "An act for the punishment of frauds committed on the government of the United States." Each indictment contained two counts. The first charged the defendant with uttering and publishing as true a certain false, forged, and counterfeit writing, purporting to be in support of a claim by a surviving soldier, for the bounty land to which he might be entitled under the act of congress granting bounty land to certain officers and soldiers who have been engaged in the military service of the United States, passed March 3, A. D. 1855 [10 Stat. 701]. The second count charged him with transmitting to and presenting at the office of the commissioner of pensions, with intent to defraud the United States, the counterfeit writing described in the first count of the indictment, in support of the said claim for bounty land. The second count, as it appears in one of the indictments, was, with the omission of mere words of description, as follows: "That Christopher Armstrong did feloniously, falsely, fraudulently, and unlawfully, with intent to defraud the United States, transmit to and present at, and cause and procure to be transmitted to and presented at, a certain office of the government of the United States, to wit, the office of the commissioner of pensions, a certain false, forged, and counterfeit writing, purporting to be a declaration made by a surviving soldier, for the purpose of obtaining the bounty land to which such surviving soldier might be entitled under the act of congress granting bounty land to certain officers and soldiers who have been engaged in the military service of the United States, passed the third day of March, A. D. 1855."

The evidence on the part of the prosecution showed that certain papers, consisting of a declaration, in the form usual in cases of application for bounty land, and certain affidavits and writings in its support, relative to an alleged claim by a person purporting to be entitled to the benefit of the act of congress of March 3, 1855, were transmitted through the mail from Philadelphia to the office of the commissioner of pensions at Washington. The documents purported to come from one Jacob Helmer, and were sent to Washington in a letter, addressed to the commissioner of pensions, signed by Helmer. This letter made the request that communications, in relation to the inclosed claim, from the pension office, be directed to the writer and applicant, at 1317 South Philadelphia. Pending the action of the commissioner of pensions upon this applica-

tion, a declaration, with the accompanying papers relative to another claim for bounty land under the same act of congress, was transmitted to the pension office from Philadelphia. They purported to have been executed by one George B. Anderson, and named George W. Moneypenny as the attorney of the applicant for the prosecution of the claim. The commissioner of pensions, having reason to doubt the genuineness of both of the claims referred to, and to believe that they were both the work of the same hand, in order to discover the person who had transmitted them, directed a letter to be prepared at the pension office, and sent to "George W. Moneypenny," the attorney named in the Anderson claim, at Philadelphia. This letter was mailed to Philadelphia, and at the same time the postmaster there was requested by the commissioner to observe particularly the person who made application for the letter at the window of the post office, and to discover, if possible, who he was, and where he resided. A few days after this decoy letter reached the post office at Philadelphia, a person, who was recognized as the defendant in this case, inquired at the delivery window for a letter to George W. Moneypenny. The clerk asked him to call at the chief clerk's desk, within the post-office building, for the letter, and told him that the letter would be handed to him there; but when the defendant left the delivery window, instead of proceeding to the desk of the chief clerk, he turned into the street and walked away. He was followed, however, by the postmaster, who had heard the defendant from within the office inquire for the Moneypenny letter, and subsequently by a police officer, to whom he was pointed out by the postmaster. The defendant pursued a devious route from the post office to the neighborhood of Thirteenth and Spruce streets, where he entered the dwelling of a well-known citizen of Philadelphia, when the police officer lost sight of him.

Subsequently another letter was written by the commissioner of pensions and directed to Jacob Helmer, No. 1317 South Philadelphia. It was mailed to Philadelphia, and the postmaster there was requested to take steps for the arrest of the person who called for it. A young man who said that he had been sent to the post office for the letter by Jacob Helmer, made application for it. He was told by the postmaster that he would require a written order from Helmer before the letter could be delivered. The boy left the office, and soon returned with the required order, signed "Jacob Helmer." Upon further questioning, however, in the presence of a detective police officer, the lad confessed that his father, who lived at 1317 South street, Philadelphia, had sent him for the letter, and had written the order. A police officer was then sent to take the defendant into custody. He was found at the house

indicated in South street. The father and son being confronted at the mayor's office, the latter repeated substantially the statement that he had made at the post office; but the defendant strenuously denied having written the order signed "Jacob Helmer," which the son had produced when he applied for the letter. Upon the trial, the prosecution called this lad to the witness stand; but he refused to testify, on the ground that he would not "give evidence against his father." The defendant was arraigned and tried upon the indictments, which charged the uttering and transmission of the papers in the Helmer application.

After the United States had proved the counterfeit character of the papers, the forgery of the alderman's signature to the jurat attached to the declaration, the circumstances attending the application at the post office for the decoy letter to Jacob Helmer, the arrest of the defendant at 1317 South street, and had given some evidence to show that the body of the counterfeit papers was in the handwriting of the defendant, the law officers of the United States offered to prove the transactions already described, in connection with the other application, which we may call the Anderson or Moneypenny application, for bounty land. The defendant's counsel objected to the introduction of this evidence, but the learned district judge overruled the objection, upon the general ground that the question was one of fraudulent intent, and that, upon questions of that sort, where the intent of the party is in issue, it has always been deemed allowable to introduce evidence of other acts and doings of the party of a kindred character, in order to establish his intent or motive in the particular act directly in judgment.

Upon the argument of the case before the court and jury, the counsel for the defence asked the learned district judge to charge the jury that the evidence submitted on behalf of the prosecution did not sustain the first counts of the indictments, inasmuch as the clause of that section of the act of 1823 under which the indictments were preferred described the offence of uttering and publishing any false, forged, and counterfeit paper for the purpose of obtaining or receiving from the United States, or an agent or officer thereof, any sum or sums of money, and that the papers given in evidence by the prosecution, if they were false, and were uttered by the defendant, were uttered and published to obtain bounty land, and not money. The counsel, therefore, asked the court to charge the jury that they ought to render a verdict of not guilty under the first counts of the indictment. The counsel for the defence also argued to the court and jury that the second (or transmission) counts of the indictments were bad, in that they described what are substantially, and within the words of the statute, two separate and distinct offences, viz. transmitting to and presenting at the

office of the commissioner of pensions the writings in the indictments described.

CADWALADER, District Judge, charged the jury, in reference to the first counts, conformably to the request of ·the defendant's counsel. but sustained the second counts of the indictment as good in law. The jury found the defendant not guilty under the first counts, but guilty under the second counts of the indictments. The defendant then moved in arrest of judgment, and assigned the following reason: "All counts, and every count, describing the offence as that of transmitting to and presenting at an office of the government a false and forged application for bounty land, allege two distinct and incompatible offences, which demand for trial two distinct venues."

In view of the practical importance of the question raised by this motion, the district judge requested Judge GRIER, the circuit justice, to sit during the argument and to decide the point, intimating that, as a writ of error would remove the record to the circuit court, he would arrest the judgment, if Judge GRIER thought the indictments bad.

On the 12th day of September, 1862, the cause was accordingly argued before GRIER, Circuit Justice, and CADWALADER, District Judge.

Henry M. Phillips (John M'Intire, of counsel), for defendant. contended:

(1) That each of the offences charged in these indictments is a felony, expressly so described and declared in the act of congress.

(2) That the offence of transmitting a false and forged paper to a public office or officers of the United States was separate and distinct from that of presenting to such office or officers a paper of that description. The one might be committed within this district. The other could not be committed save in Washington. if the office in question were that of commissioner of pensions, as in this case, which is located at the seat of government. Congress manifestly intended to provide for the two distinct cases of transmission to and presentation at a public office of forged documents. The phraseology of the clause of the section of the act of 1823 in question was dealt upon as confirmatory of this view; the use of the words "to" and "at." and especially of the word "or," connecting the phrases "transmit to" and "present at."

(3) That if the offences are felonies. and are separate and distinct, they cannot be joined in one count And they cited Whart. Cr. Law, § 381, and the cases therein referred to.

George A. Coffey, U. S. Dist. Atty., and J. Hubley Ashton. Asst. U. S. Atty., for the prosecution, argued:

(1) That the counts in question are substantially like the count in the indictment which was before the supreme court of the United States in the case of United States v. Staats, 8 How. [49 U. S.] 41.

(2) That this indictment must be sustained upon the principle which governed this court in sustaining the precedent of the indictment now used in this district in cases of counterfeiting, where the offences of making and causing to be made counterfeit money are always joined in the same count. This court has, therefore, expressly adjudicated the present question.

(3) That the indictments being in the very words of the statute, the rule of criminal pleading pertaining in the United States courts is fully satisfied. U. S. v. Goding, 12 Wheat. [25 U. S.] 474.

GRIER, Circuit Justice. I am of opinion that · the indictments are well drawn; and that the counts to which the reason in arrest of judgment applies are sustainable in law. The common law refinements in criminal pleading are not applicable to statutory offences under the laws of the United States. It is sufficient, usually, to allege the offence in the very terms of the statute. It will be observed that the framers of this act of 3d March, 1823, have, in the first section, the section in question, divided the offences therein created and defined into three general classes. The first class includes the offences of making and aiding the making of false writings; the second, those of uttering and causing to be uttered such writings, with intent to defraud the United States; and the third class embraces the crimes to which the third counts of these indictments apply,— those of transmitting to and presenting at any office of the government of the United States counterfeit papers in support of or in relation to claims against the United States. The law-maker have divided and classified the offences described for the pleader. These indictments have been drawn with reference and in conformity to this arrangement of the statutes; and I think that the reason assigned for the motion in arrest of judgment is not valid, and that the motion should be overruled.

CADWALADER. District Judge, accordingly overruled the motion, and pronounced judgment upon the verdict. On the question of "district venues," he referred to State Tr. 727–729, 740.

UNITED STATES (ARMSTRONG v.). See Cases Nos. 548 and 549.